J. O. SEXTON, Administrator, Appellant, v. C. L. PERCIVAL COMPANY et al., Appellees.

CORPORATIONS: Ownership of Stock Dividends Under Agree-
1  ment to Resell. A holder of corporate shares of stock who has purchased them under an agreement that he shall receive "all dividends" thereon during his lifetime, but that the seller may repurchase after the death of such holder, is the absolute owner of *stock* dividends declared and issued on said stock during the lifetime of the said holder, when such stock dividends represent *income* or *earnings* of the company, and not the natural growth or increase in value of its permanent property.

CORPORATIONS: Dividends—Presumption. Stock dividends are
2  presumed to represent *earnings*. Corporate records reviewed, and held not to overcome the presumption.

CORPORATIONS: Nature of Earnings. Earnings of a corporation
3  remain such until the intent to make them a part of the permanent property of the corporation is in some way manifested.

CORPORATIONS: Dual Way of Distributing Earnings. Earnings
4  may be divided in two ways: (1) By declaring and paying a *cash* dividend; or (2) by declaring and issuing a stock dividend.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

APRIL 13, 1920.

REHEARING DENIED SEPTEMBER 25, 1920.

IN this suit, begun February 21, 1918, the plaintiff, as executor of C. M. Sexton, deceased, prays that the defendant C. L. Percival Company and its officers be required to issue a certificate for 15 shares of stock to him, as such executor. Prior to 1901, a corporation known as the D. H.

McDoneld Company was organized. On June 23d of that year, C. L. Percival sold to Sexton a certificate of 10 shares of stock of the par value of $100 each, known as Certificate No. 15, in that company, on terms substantially as hereinafter recited. This stock was left with the Des Moines Savings Bank, as trustee. In February, 1904, the name of the company was changed to C. L. Percival Company, and Certificate No. 15 was surrendered, and a certificate for 10 shares, known as No. 7, in the latter company, was issued in its stead, and left with the bank. At a directors' meeting, immediately following a stockholders' meeting, on January 13, 1908, a motion was adopted:

"That the 20 shares of stock now held by the Des Moines Savings Bank as trustee for C. F. Percival be turned back to the company, and 20 shares in lieu of the same be issued direct to C. F. Percival. Motion carried. It was further moved and seconded that the 10 shares of stock now held by the Des Moines Savings Bank, as trustee for C. M. Sexton, be put in such shape that said C. M. Sexton can draw the dividends on same as long as he lives. At his death, stock shall be sold back to C. L. Percival or his assignees at par value."

On June 23d following the death of the decedent, C. L. Percival Company and the Des Moines Savings Bank entered into an agreement with reference to the 10 shares of stock evidenced by Certificate No. 15.

"First. That, in consideration of the sum of $1,000, the receipt whereof is hereby acknowledged, the said Percival has hereby sold, subject to the terms of this agreement, to the said C. M. Sexton, 10 shares of the capital stock of the said C. L. Percival Company.

"Second. In the event of the death of the said C. M. Sexton, the said C. L. Percival, his heirs or assigns, shall, for 90 days thereafter, have the right to repurchase the said stock, at his election, and, in the event that he elects to so repurchase the same, the said C. L. Percival, his heirs or assigns, shall pay therefor the sum of $100 per share, plus interest upon the said amount from the date of the last

dividend paid upon the said stock to the date of such purchase, at the rate of 8 per cent per annum.

"Third. In order to effectuate the purposes of this agreement, the stock so purchased by the said C. M. Sexton has been issued to the Des Moines Savings Bank, trustee, and shall be held by it in trust for the parties hereto, pursuant to the terms of this agreement, until such time, if any, as said Percival, his heirs or assigns, shall elect to repurchase the said stock, subject to the terms of this agreement. All dividends upon the said stock during said period shall be paid to the said C. M. Sexton as they become due, and the said C. M. Sexton shall have the right, during the said period, to vote the said stock at all meetings of the said corporation; but he shall not pledge or transfer said stock, or otherwise prevent the carrying out of this agreement.

"Fourth. In the event the said C. L. Percival, his heirs or assigns, shall, under this contract, elect to repurchase the said stock, he shall pay the purchase price therefor to the said bank, as trustee, and the said bank shall thereupon transfer the said stock to the said C. L. Percival, his heirs or assigns, and pay over the said purchase price to the executors or administrators of said C. M. Sexton. If, having the right to repurchase said stock, said C. L. Percival, his heirs or assigns, shall elect not to do so, said bank shall thereupon, and after 90 days after the death of said C. M. Sexton, transfer the same to his said executors or administrators, whose title thereto shall thereupon become absolute."

At a stockholders' meeting in January, 1913, a resolution was adopted, amending its articles so as to increase the amount of capital stock from not in excess of $50,000 in the aggregate to "not in excess of $100,000," and striking the limitation of the preferred stock to the amount of common stock, from the articles. The officers were directed to effect these changes, and they so did. Following adjournment of the stockholders' meeting, the directors convened, and, after the election of officers, resolved:

"That a dividend of 25 per cent of the par value of the

capital stock of this company that has been issued be and is hereby declared. Said dividend to be paid in cash at once to the stockholders of this company as they appear of record on the first day of January, 1913."

Thereupon, a resolution declaring a stock dividend of 150 per cent, with preamble as follows, was adopted:

"Whereas, the authorized capital stock of the C. L. Percival Company was, at the annual meeting of the stockholders, on January 13, 1913, increased, by amendment to its articles of incorporation, from $50,000 to $100,000, in order to take care of the growing needs of the company; and whereas, the surplus or undivided earnings of the C. L. Percival Company, as of the 1st day of January, 1913, amounted in the aggregate to $47,345.28; and whereas, it is deemed advisable to set aside of the surplus or undivided earnings of the company the sum of $30,000 as a stock dividend to the common stock now outstanding, amounting to $20,000; and whereas, it is desired to sell for cash, at not less than $150 per share, the remaining portion of the increased issue of common stock, i. e., $25,000."

On March 25, 1913, C. L. Percival, as president, and Carl F. Percival, as secretary and treasurer, executed, under the seal of the C. L. Percival Company, a certain stock certificate No. 58, for 25 shares of the capital stock of the C. L. Percival Company, of the par value of $100 each, said certificate being issued in the name of the Central Trust Company, trustee, and having written on the top thereof the name "C. M. Sexton;" and the stub from which said certificate was originally detached, bears the following endorsement:

"Certificate No. 58, 25 shares. Issued to Central Trust Company, trustee for C. M. Sexton, dated March 25, 1913. From whom transferred, Des Moines Saving, Trustee, dated February 1, 1904. No. original certificate, 7. No. original shares, 10. Stock Dividend, 15. No. of shares transferred, 25."

The blank form of receipt on the stub was not signed, and Certificate No. 58 was never delivered, nor any in its

stead. Within 90 days from Sexton's death, Percival paid par value, with interest, as stipulated, to the Des Moines Savings Bank, and thereupon the original certificate No. 7, for 10 shares of stock, was surrendered to him, and, on June 20, 1917, in lieu thereof and of Certificate No. 58, the company issued a certificate No. 77, for 10 shares, and a certificate for 15 shares, known as No. 78, to Percival. No dividend has been paid to decedent or to the executor of his estate since January, 1917. During the last 4 years, or after the stock dividend, decedent was paid dividends on 25 shares of stock, and prior thereto, on 10 shares. During all this time, he was one of the four directors of the company, actively participated in its management, served as bookkeeper, and later as cashier, at a salary. The court, on final hearing, entered its decree:

"That, upon the payment, within 90 days from the entry of final decree in this cause, to the plaintiff by the defendant C. L. Percival, of the sum of $1,500, together with 8 per cent interest thereon from January 15, 1917, said defendant shall be and become the absolute owner of said 15 shares of dividend stock in said C. L. Percival Company, together with all rights which have accrued thereunder since said last-named date, and all rights which may hereafter accrue thereunder; that, in default of such payment to the plaintiff by the defendant C. L. Percival, the defendant Percival Company, through its proper officers, shall issue and deliver to the plaintiff said 15 shares of stock as and pursuant to the said stock dividend of February 22, 1913."

One half of the costs was taxed to each party, and each appealed on the same day.—*Reversed.*

*Brookhart Bros.* and *Charles W. Lyon,* for appellant.

*Miller, Parker, Riley & Stewart,* for appellees.

LADD, J.—The plaintiff is the executor of the estate of C. M. Sexton, deceased, and as such prays for an order directing the C. L. Percival Company and its officers to issue to

1. CORPORA-
TIONS: own-
ership of
stock divi-
dends under
agreement to
resell.

him, as such executor, a certificate of 15 shares of the capital stock of that company. It appears from the record that, on December 10, 1901, the decedent, being in the employment of the D. H. McDoneld Company, arranged to purchase 10 shares of the capital stock of said company from C. L. Percival. This was done, but on terms substantially like those entered into after the name of the company had been changed to C. L. Percival Company. Such change occurred in 1904, and on June 23, 1908, a new contract was entered into, under which the certificate for 10 shares of stock was deposited with the Des Moines Savings Bank, as trustee, on conditions that:

"In the event of the death of the said C. M. Sexton, the said C. L. Percival, his heirs or assigns, shall, for 90 days thereafter, have the right to repurchase the said stock at his election, and, in the event that he elects to so repurchase the same, the said C. L. Percival, his heirs or assigns, shall pay therefor the sum of $100 per share, plus interest upon the said amount from the date of the last dividend paid upon the said stock to the date of such purchase at the rate of 8 per cent per annum.

"Third. In order to effectuate the purposes of this agreement, the stock so purchased by the said C. M. Sexton has been issued to the Des Moines Savings Bank, trustee, and shall be held by it in trust for the parties hereto, pursuant to the terms of this agreement, until such time, if any, as said Percival, his heirs or assigns, shall elect to repurchase the said stock, subject to the terms of this agreement. All dividends upon the said stock during said period shall be paid to the said C. M. Sexton as they become due, and the said C. M. Sexton shall have the right, during the said period, to vote the said stock at all meetings of the said corporation, but he shall not pledge or transfer said stock, or otherwise prevent the carrying out of this agreement.

"Fourth. In the event the said C. L. Percival, his heirs or assigns, shall, under this contract, elect to repurchase

the said stock, he shall pay the purchase price therefor to the said bank, as trustee, and the said bank shall thereupon transfer the said stock to the said C. L. Percival, his heirs or assigns, and pay over the said purchase price to the executors or administrators of the said C. M. Sexton. If, having the right to repurchase said stock, said C. L. Percival, his heirs or assigns, shall elect not to do so, said bank shall thereupon, and after 90 days after the death of said C. M. Sexton, transfer the same to his said executors or administrators, whose title thereto shall thereupon become absolute."

Sexton, who was a single man, died April 21, 1917, and, within 90 days thereafter, in pursuance of the terms of the contract, C. L. Percival deposited the necessary amount with the Des Moines Savings Bank, and it surrendered the 10 shares of stock. A. stock dividend of 150 per cent was declared in 1913, and a certificate of 15 shares issued as a stock dividend on the original 10 shares, March 25, 1913; and the sole issue raised by counsel is whether these passed to C. L. Percival, upon repurchasing the original 10 shares of stock, or to the executor of the estate of the decedent. In other words, Was the stock dividend declared in order to distribute the income or earnings of the company, or as representing the natural growth or increase in the value of its permanent property—a mere change in the form of ownership? If the latter, then the 15 shares issued as a stock dividend, with the 10 shares, represented no greater part of the company's property than did the 10 original shares, and manifestly must have been turned over to Percival, upon repurchase of the latter; but if the former, then the dividend in stock passed to decedent, under the clause entitling decedent to all dividends on the stock.

It is to be observed that the relation of the parties was analogous to that of life tenant and remainderman, under a will or other instrument. Under the contract, "all dividends upon said stock during said period (life of Sexton) shall be paid to said C. M. Sexton, as they become due," and, within 90 days after the expiration of such period,

Percival might repurchase, and thereby acquire the same title thereto as would a remainderman at the expiration of the life estate. The rule which obtains in such cases in this state was settled in *Kalbach v. Clark*, 133 Iowa 215, where the court, speaking through the late Justice Deemer, said:

"We start with the notion that all pure dividends, whether in cash or stock, or other property, are a part of the income, and, when declared, should go to the life tenant, and not to the remainderman, as it is not a part of the corpus of the property, but a part of the income derived from the use and management thereof. Any dividends, so called, presumptively belong to the life tenant, as they are, in the absence of a showing to the contrary, assumed to have been divided as profits. If, however, the so-called stock dividends represent the corporate capital, that is, represent nothing but the natural growth or increase in the value of the permanent property, so that there is merely a change in the form of ownership, such stock should go to the remainderman; for in such cases the dividend is a dividend of capital, representing simply an increase in the value of the physical property, good will, or other thing of tangible value.   *   *   *   Under this rule it becomes a question of fact as to the actual nature of the dividend. The mere fact that the directors of the corporation call it either one thing or the other is not controlling."

It is often difficult to ascertain the precise nature of a specific stock dividend. The presumption obtains that all stock dividends are a part of the income, and, when declared, go to the life tenant. The burden of proof to show that the dividend was not of the income or profits was on the defendants. The board of directors, in their resolution declaring the dividend, recited, by way of preamble, that:

2. CORPORA-
TIONS : divi-
dends : pre-
sumption.

"Whereas, the surplus or undivided earnings of the C. L. Percival Company, as of the 1st day of January, 1913, amounted in the aggregate to $47,345.28; and whereas, it is

deemed advisable to set aside, of the surplus or undivided earnings of the company, the sum of $30,000 as a stock dividend to the common stock now outstanding, amounting to $20,000; and whereas, it is desired to sell for cash, at not less than $150 per share, the remaining portion of the increased issue of common stock, i. e., $25,000."

This recital indicates plainly the design of the directors to have been the distribution *pro rata* among the shareholders of the profits, in the form of surplus or undivided earnings. Were there profits so to distribute? Bearing in mind that such is the presumption, in view of the declaration of the dividend, we examine the record to ascertain if anything appears therein tending to show the contrary. The capital stock of the corporation was $20,000, divided into 200 shares, of par value of $100 each. Though it was organized prior to 1901, no evidence of its financial condition previous to January 1, 1907, was adduced. There appears to have been a surplus of $29,827 at that time. It must have exceeded this, prior to that date; for a new building at a cost of $36,450 was included in its assets, without increase of capital, but with an incumbrance of $15,000. Sexton purchased the stock of Percival in 1901, under contract similar to that of 1908. The changing of the name of the corporation in 1904 did not interfere with such contract, nor did the substitution of a certificate of 10 shares, issued by the corporation under the name of C. L. Percival Company, in the place of a certificate for like number of shares, previously issued by the same corporation under the name of D. H. McDoneld Company. The contractual relations between Sexton and Percival were not changed from the date of purchase until Sexton's death. True, the directors resolved, in January, 1908, "that the 10 shares of stock now held by the Des Moines Savings Bank be put in such shape that said C. M. Sexton can draw dividends on the same as long as he lives; that, at his death, said stock shall be sold back to C. L. Percival or his assigns at par value." This much was provided for in the contract of December 10, 1901, but added nothing to the rights or privileges of either

Sexton or Percival. The contract of 1908, made, as Percival testified, to carry out this resolution, differed, in substance, only in date and description of the company. The record is without proof of when or how the surplus existing in 1907 was created. According to Webster's Dictionary, the word "surplus" means "excess or overplus; *  *.  * as distinguished from capital stock of a corporation, the excess of net assets over the face value of its shares." It is not unusual, in organizing corporations, to create a surplus by exacting payments in excess of the par value of shares; and often a surplus arises from the increased value of its property. Ordinarily, the term "surplus," as used in financial statements of corporations, indicates its accumulated earnings or profits, whether in money or otherwise, as distinguished from the par value of its capital stock, and it appears to have been so employed in the nine yearly statements following that of 1907. Aside from the large cash dividends declared, the surplus gradually increased $17,-518.01, during the five years following that date, without taking into account any increase in the value of property in its nature permanent. There is a clear distinction between accretions to the fund derived from earnings accumulating during the life estate and the enhanced value of the trust property due to other causes. The one is income; while the other is capital—a part of the corpus of the estate. A comparison of these statements demonstrates, as nearly as may be, that this increase of surplus consisted of accumulated earnings or profits of the company. If the surplus of 1907 did not consist of profits or earnings of the company, what was it? How did it arise? No answer other than as above stated, is to be found in the record. The value of property permanent in its nature, credited in the statement of that year as part of the assets, when compared with such values in other statements, precludes the inference that the surplus in the several statements was made up from enhancements in value of such property. Let the statements speak for themselves.

C. L. Percival Company.
January 1, 1907.
Assets.

| | |
|---|---|
| Mdse. (Hides and Furs)........................$ | 20,985.39 |
| Rend. Wks. (Stock on Hand).................. | 3,335.33 |
| Butcher Tools (Stock on Hand)............... | 21,153.82 |
| Accounts Outstanding (Good)................ | 10,705.18 |
| Teams, Wagons, etc.......................... | 2,200.00 |
| New Building (Cost) ........................ | 36,450.60 |
| Hide Building Second St...................... | 200.00 |
| Rend. Works, Real Estate.................... | 3,800.00 |
| Rend. Works, Fixtures....................... | 1,700.00 |
| Real Estate E. First St...................... | 5,051.31 |
| | $105,581.63 |

Liabilities.

| | |
|---|---|
| Capital Stock ...............................$ | 20,000.00 |
| Due Bank .................................. | 24,000.00 |
| Mtge. on Building........................... | 15,000.00 |
| Mtge. on R. W.............................. | 2,640.00 |
| Due Employees ............................. | 9,616.37 |
| Cash Overdrawn ............................ | 1,053.03 |
| Butcher Tools .............................. | |
| Bills Unpaid ............................... | 3,444.42 |
| Surplus ................................... | 29,827.81 |
| | $105,581.63 |

The statement of 1913, when compared with that above, of 1907, indicates clearly the nature of the additions to the surplus.

C. L. Percival Company
Statement
January 1, 1913.
Assets.

| | |
|---|---|
| Cash & Accounts Receivable.................$ | 34,768.17 |
| Mdse. on hand.............................. | 18,904.79 |
| B. Tool Stock on hand ...................... | 28,364.63 |

Factory Stock on hand.......................    17,405.96
Teams & Equipment..........................     2,478.05
Hide House, 2d St...........................       100.00
Rend. Works Stock ..........................     1,986.53
Rend. Works Real Estate.....................     3,800.00
Rend. Works Equipment.......................     1,977.00
Warehouse Building .........................    36,506.87
Factory Building............................     5,385.87
Factory Equipment ..........................     3,513.97
Office Equipment ...........................     1,464.00
Rent, Int. & Ins. Paid in Adv...............     1,764.00

                                               $158,419.84

### Liabilities

Capital Stock ..............................$ 20.000.00
Notes Payable ..............................    83,906.46
Accts. Payable .............................     3,682.50
Reserve for Depreciation, Warehouse.........     2,518.63
Factory Building ...........................       538.58
Factory Equipment ..........................       351.39
Rend. Works Equipment ......................        77.00
Surplus ....................................    47,345.28

                                               $158,419.84

The earning capacity of this company is illustrated by the cash dividends declared. A cash dividend of 50 per cent was declared in 1903, of 60 per cent in 1904, of 40 per cent in 1905, and of 25 per cent each year thereafter until 1911, which was passed, and a dividend of 25 per cent was declared in 1912, and also in 1913. As pointed out, the earnings or profits in the sum of $17,518.01 accrued subsequent to the statement of 1907. This amount might have been distributed by the stock dividend, as was done, and must have gone to the life tenant. The statement of that year indicates that the surplus of $29,827.81 also accumulated from the business of the company. Out of this, $5,000 was paid out as a dividend. When or how the remainder,

of $24,827.01, was earned or added, we have no means of knowing. If it had been made a permanent part of the capital or corpus of the company in some manner, this must have been known by its officers, and the circumstance that defendants adduced no evidence bearing on the subject tends to confirm, rather than overthrow, the presumption that the dividend was of the profits or earnings of the company. Nor is such presumption impaired by the fact that large cash dividends mentioned, were declared.

Counsel argues, as indicating that the dividend could not have been from the earnings, that the corporation was in such financial condition that a cash dividend in like amount

3. CORPORA-
TIONS:
nature of
earnings.

might not have been paid without borrowing money. This is true, and furnishes the strongest reason for making a stock dividend. The very purpose of a stock dividend is to retain the earnings in the business, and issue stock evidencing same, instead of paying cash, or other property. It is not necessary that the earnings be set aside in money, to prevent them from being absorbed in the capital of the company, nor to segregate them into a separate account. They continue such until the intent to make them a part of the permanent property or corpus of the company is in some way manifested. In a sense, as counsel contends, every stock dividend is a mere matter of bookkeeping. No money is paid out or taken in. The property of the corporation continues unchanged. The accumulated profits, whether in money or property, are undisturbed. All that happens is the issuance of the certificates of stock, and changing the books so as to show a corresponding increase in capital stock, and this for the purpose of distributing such profits or income *pro rata* to the shareholders, and in that manner capitalizing the earnings. The earnings, as such, cease to belong to the corporation, but become absorbed in its capital, and are represented by the new shares, issued as a dividend. Counsel for defendants concedes, as he must have, that there were accretions representing the earnings of the corporation, but suggests that "the great advance in

the total of the assets column from the time of the breaking out of the world war is undoubtedly accounted for in part by the enhanced market value of the average of merchandise on hand." But the war did not begin, nor was it declared, until a little more than 17 months after the dividend was declared. We agree with *Jennery v. Olmstead*, 36 Hun 536, in holding that profits are not proven to have been earned by showing an increase in the market price, but must have been realized, to be denominated as such. For all that appears, the merchandise and other property of this company may have been of greater value than credited in the assets column, but such increase was not included.

We do not agree, however, that the word "dividend" has indefinite meaning, when employed in contracts relating to corporate stock. In *Lockhart v. Van Alstyne*, 31 Mich. 76 (18 Am. Rep. 156), the court, speaking through Cooley, J., said:

"A dividend to the stockholders of a corporation, when spoken of in reference to an existing organization engaged in the transaction of business, and not of one being closed up and dissolved, is always, so far as we are aware, understood as a fund which the corporation sets apart from its profits to be divided among its members. A corporation of which it is said that it is making an annual dividend of 10 per centum upon its stock, is supposed to be a prosperous corporation, because its gains leave it this clear annual percentage, which it can pay over without impairing its capital. A dividend among preference stockholders exclusively, is understood to imply that the sum divided has been realized as profits, though the earnings do not yield a dividend to the stockholders in general. We hazard nothing in saying that this is the primary and universal understanding of a dividend on stock, except when made use of in respect to a final closing up and distribution of assets on the occurrence of insolvency or in view of a dissolution."

See, also, *Jones v. Concord & M. R. Co.*, 67 N. H. 119 (38 Atl. 120); *Rose v. Barclay*, 191 Pa. St. 594 (45 L. R. A.

392). In 2 Cook on Corporations (7th Ed.), Chapter 32, Section 534, a dividend is defined as:

"A corporate profit, set aside, declared, and ordered by the directors to be paid to the stockholders on demand, or at a fixed time. Until the dividend is declared, these corporate profits belong to the corporation, not to the stockholders, and are liable for corporate indebtedness."

"[A stock dividend] is lawful when an amount of money or property equivalent in value to the full par value of the stock distributed as a dividend has been accumulated, and is permanently added to the capital stock of the corporation. * * * In this country, these dividends are frequently made, and are sustained by the courts." 2 Cook on Corporations (7th Ed.), Chapter 32, Section 536.

This definition is approved in *DeKoven v. Alsop,* 205 Ill. 309 (63 L. R. A. 587). See, also, *State v. Bank of Commerce,* 95 Tenn. 221 (31 S. W. 993); 3 Words and Phrases 2143 *et seq.* That the word was employed in the sense above indicated, is not open to controversy, in view of the context and the circumstances disclosed. That decedent so construed it, appears from his refusal to enter into the contract prepared by Percival, permitting the latter to repurchase the original 10 shares, together with the 15 shares of the dividend, at the price of the former. This happened in 1913, and nothing further was said. As Sexton was receiving the dividends on the 25 shares, there was no occasion for pressing the claim of title to the shares belonging to decedent, and it ought not to be said that decedent, who was bookkeeper of the company, by not entering into further controversy with the president thereof over the title to the 15 shares of stock, acquiesced in the latter's claim of the right to repurchase these on the terms claimed. The authorities cited by defendants are not in point. In *Spooner v. Phillips,* 62 Conn. 62 (16 L. R. A. 461), the articles of incorporation authorized the corporation to increase or diminish the shares of stock issued, as might seem to it best; and it was by virtue of this power, and not as stock

dividends, that the stock of the corporation was increased. As said by the court:

"The new shares were not, strictly speaking, the product of stock dividends, nor did they represent, in the ordinary sense, surplus earnings;" and it was found that the intention of the testator was the gift of the original shares, without others issued by way of increase. In *Wilberding v. Miller,* 88 Ohio St. 609 (106 N. E. 665), and *Guthrie's Trustee v. Akers,* 157 Ky. 649 (163 S. W. 1117), dividends were not declared, and all held was that, without declaration of dividends, the surplus does not pass to the life tenant. In *Kaufman v. Charlotteville Woolen Mills Co.,* 93 Va. 673 (25 S. E. 1003), the plaintiff claimed a 27 per cent stock issue, declared January 16, 1896, on the theory that he had reserved dividends up to January 1st of that year, and that the profits were on hand prior thereto, and could have been distributed. The court, after describing a stock dividend as characterized by the so-called Massachusetts rule, under which all such dividends are retained by executor or trustee for the remainderman, observed that:

"The accumulated profits of a corporation belong to the company; and, acting in good faith, and for the best interest of all concerned, the corporation may capitalize the surplus, or it may invest it in its work and plant so as to secure and increase the permanent value of its property, or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years, or it may distribute its earnings at once to its stockholders as income. Which of these courses is to be pursued must be determined by the directors, with due regard to the condition of the company's property and affairs as a whole; and, except in case of fraud and bad faith on their part, their discretion in this respect cannot be controlled by the courts."

These decisions are in harmony with the rule laid down in *Moss's Appeal,* 83 Pa. St. 264 (24 Am. Rep. 164), where the court said:

"As a general rule, nothing earned by a corporation can

be regarded as profits, until it shall have been declared to be so by the corporation itself, acting by its board of managers.   The fact that a dollar has been earned gives no stockholder the right to claim it until the corporation decides to distribute it as profit.   The wisdom of such distribution must, of necessity, rest with the corporation itself. From motives of prudence and self-interest, it is frequently desirable to add all or a portion of the earnings to the capital.   This is sometimes necessary as a basis of credit for more enlarged operations.   It is often a wise exercise of discretion for a corporation to strengthen itself in this way, and with such discretion a stockholder cannot interfere. His only remedy is by an appeal to the ballot at the election for directors.   But where a corporation, having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction.   Equity, which disregards form and grasps the substance, would award the thing distributed, whether stock or moneys, to whomsoever was entitled to the profits."

So well established is this rule that citation of authorities is unnecessary.   See, also, *Hite's Devisees v. Hite's Executor*, 93 Ky. 257 (40 Am. St. Rep. 189), where the rule prevailing is like that of Pennsylvania, save as to apportionment, and in which the court stated that:

"Where a dividend, although declared in stock, is based upon the earnings of the company, it is in reality, whether called by one name or another, the income of the capital invested in it.   It is but a mode of distributing the profit. If it be not income, what is it?   If it is, then it is rightfully and equitably the property of the life tenant.   If it be really profit, then he should have it, whether paid in stock or money.   A stock dividend proper is the issue of new shares, paid for by the transfer of a sum equal to their par value from the profit and loss account to that representing capital stock; and really a corporation has no right to declare a dividend, either in cash or stock, except from its earnings;

and a singular state of case—it seems to us an unreasonable one—is presented, if the company, although it rests with it whether it will declare a dividend, can bind the courts as to the proper ownership of it, and by the mode of payment substitute its will for that of the testator, and favor the life tenant or the remainderman, as it may desire. It cannot in reason be considered that the testator contemplated such a result. The law regards substance, and not form, and such a rule might result, not only in a violation of the testator's intention, but it would give the power to the corporation to beggar the life tenants, who, in this case, are the wife and children of the testator, for the benefit of the remaindermen, who may, perhaps, be unknown to the testator, being unborn when the will was executed. We are unwilling to adopt a rule which, to us, seems so arbitrary and devoid of reason and justice. If the dividend be, in fact, a profit, although declared in stock, it should be held to be income."

Whether stock or cash dividend shall be issued was purely discretionary with the board of directors (*Lauman v. Foster*, 157 Iowa 275), and we are unable to find any ground for saying that such dividend was not of "undivided earnings," as that body asserted in declaring this stock dividend, and as the law presumed.

4. CORPORA-
TIONS: dual
way of dis-
tributing
earnings.

The doubtful question in the case is, as we think, whether the contract, in providing that "all dividends upon the said stock during said period shall be paid to the said Sexton as they become due, should be construed as including stock dividends." Ordinarily, in referring to dividends, those in money are intended. In *Kaufman v. Charlotteville Woolen Mills Co.*, supra, it was said that:

"A stock dividend is not, in the ordinary sense, a dividend; the latter being a distribution of profits to stockholders, as income from their investment. A stock dividend is merely an increase in the number of shares, the increased number representing exactly the same property that was represented by the smaller number of shares."

In *Spooner v. Phillips*, supra, it was said that:

"The word 'dividends,' if unqualified, signifies dividends payable in money."

See, also, *Smith v. Hooper*, 95 Md. 16 (51 Atl. 844). But here the word was qualified by "all." It added nothing, unless something other than cash dividends were intended. Dividends in stock are quite as well recognized in the law, though not so common as those in money. But they are dividends. As quoted with approval in *Rose v. Barclay*, 191 Pa. St. 594 (45 L. R. A. 392):

" 'A dividend is that portion of the profits and surplus funds of a corporation which has actually been set apart by a valid resolution of the board of directors, or by the shareholders at a corporate meeting, for distribution among the stockholders, according to their respective interests, in such a sense as to become segregated from the property of the corporation to become the property of the shareholders distributively. It is a matter of no difference whether the dividend is declared in stock or paid in cash and thereafter converted into stock by the shareholders. In either event, it is a distribution of the surplus profits of the corporation.' "

Stock dividends were there held to be included in the expression, "all dividends due or to become due" on the shares sold. If a stock dividend is to be regarded as a dividend, and it is so recognized by the courts generally, then the contract under consideration should be construed to include stock, as well as money, dividends. The manifest purpose of the parties thereto was to give Sexton the entire benefit to be derived from ownership of the 10 shares during his life, and, at the same time, secure to Percival the option of acquiring such shares again, upon Sexton's death. We reach the conclusion that plaintiff, who, as administrator, stands in the shoes of decedent, is entitled to a certificate of the 15 shares which should have been issued to decedent, and the court should have so found, and entered a decree accordingly.—*Reversed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.